## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NADEYAH JONES,
INDIVIDUALLY, AND ON BEHALF OF
OTHERS SIMILARLY SITUATED,
    *Plaintiff*,

        v.

CARECENTRIX, INC.,
    *Defendant.*

No. 3:23-cv-1071 (VAB)

## RULING AND ORDER ON PARTIAL MOTION TO DISMISS

Under 29 U.S.C. § 216(b) and Rule 23 of the Federal Rules of Civil Procedure,

Nadeyah Jones ("Plaintiff" or "Ms. Jones"), individually and on behalf of all similarly situated

persons employed by CareCentrix, Inc., ("Defendant" or "CareCentrix") brings this putative

class action based on the Defendant's alleged willful violations of the Fair Labor Standards

Act ("FLSA"), 29 U.S.C.  § 201, *et seq*., and common law. Compl., ECF No. 1, (Aug. 10,

2023); Am. Compl., ECF No. 31 (Nov. 14, 2023) ("Am. Compl."). In her Amended

Complaint, Ms. Jones has brought three counts: Count I alleges violations of the FLSA in a

failure to pay overtime and failure to calculate rates to include non-discretionary bonuses;

Count II alleges breach of contract; and Count III alleges unjust enrichment. *See* Am. Compl.

After Ms. Jones filed her Amended Complaint,[1] CareCentrix filed a Partial Motion to

Dismiss moving to dismiss the portion of Count I claiming that CareCentrix's consideration

of non-discretionary bonuses when calculating pay rates violates the FLSA. *See* Def. Partial

---

[1] Before filing an Amended Complaint, CareCentrix had moved to dismiss the original Complaint in its entirety. After Plaintiff filed an Amended Complaint, however, Defendant filed a partial Motion to Dismiss only moving to dismiss part of Count I. Accordingly, the Court will deny CareCentrix's Motion to Dismiss, ECF No. 22, as moot.

Mot. to Dismiss Am. Compl., ECF No. 37 ("Partial MTD").[2]

      For the following reasons, the partial motion to dismiss is **DENIED.**

      The Court will allow limited and directed discovery into the total amount of any and all wages allegedly owed to Ms. Jones—and Ms. Jones's alone. Discovery will not be limited to those wages related to Count I of the Amended Complaint.

### I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Allegations

      CareCentrix manages healthcare-related home services and employs nearly 2000 people across the country. Am. Compl. ¶ 2. According to its website, CareCentrix aims to "connect[s] the last mile of care[] for health plans and health systems to improve outcomes, lower total cost of care, deliver member and provider satisfaction, enhance Stars and HEDIS® measures, and guarantee savings." *Id.* CareCentrix lists its services as "Post Acute Care:Site Optimization, Readmissions Management, Home, Health, DME, Home Infusion, Home Sleep & Respiratory, and Serious Illness Care at Home." *Id.* CareCentrix allegedly employs customer service representatives ("CSRs"), also referred to as "Patient Advocate, Clinical Reviewer–Post Acute Care, Post Acute Care Advocate–Remote, and Remote Patient Billing Representative" in remote call centers located around the country. *Id.* ¶¶ 2–3.

      CSRs reportedly "receive and respond to calls from providers, refer sources, patients, and potential patients; make outbound calls to, among others, patients, hospitals, and Nurse Coaches; research, resolve, and document calls involving a wide range of issues; and communicate with internal business centers and external customers." *Id.* ¶ 3. The primary duty of CSRs is

---

[2] CareCentrix has only moved to dismiss part of Count I. The other part of Count I (involving timekeeping and "gap time"), Count II, and Count III remain.

supposedly to provide over-the-phone customer service. *Id.* ¶ 4.

From approximately November 2022 to June 22, 2023, CareCentrix allegedly employed Nadeyah Jones, a resident of McDonough, Georgia to work remotely as an hourly, non-exempt CSR, with the specific title of "Patient Advocate." *Id.* ¶ 19. Additional opt-in Plaintiffs to this collective action allegedly "were or are employed by CareCentrix as CSRs during the past three years." *Id.* ¶ 20. Ms. Jones reportedly accepted an offer from CareCentrix to work as a CSR "with the understanding that her base hourly rate would be paid for all hours worked." *Id.* ¶ 24.

Allegedly, CSRs ordinarily worked five days a week, for up to, and sometimes over, forty hours. *Id.* Ms. Jones reports working forty hours or more in a workweek on one or more occasions while employed by CareCentrix. *Id.* ¶ 28. During her period of employment as a CSR, she claims to have carried out her job responsibilities as set forth in her initial agreement with CareCentrix. *Id.* ¶ 24. Ms. Jones allegedly provided "over-the-phone customer service which included, but was not limited to, acting as the first point of contact for patients needing home healthcare services; receiving and responding to calls from providers, referral sources, and potential patients; collecting and entering clinical and demographic information; and making outbound calls to patients and hospitals." *Id.* ¶ 25. In furnishing this service, she reports using CareCentrix's computer applications to record events and customer service information. *Id.* Ms. Jones also allegedly performed "required unpaid off-the-clock work" discussed below. *Id.*

CareCentrix allegedly employed CSRs to provide telephonic customer service in remote call centers located throughout the country, and, at all relevant times, controlled CSRs' "work schedules, duties, protocols, applications, assignments, and employment conditions." *Id.* ¶¶ 2–4,31. CareCentrix reportedly gave each prospective CSR a written offer detailing the job requirements and pay rate. *Id.* ¶ 22. Plaintiffs allege that CSRs were paid at varying hourly rates,

and CareCentrix was responsible for keeping documentation of each CSR's promised wages "including, but not limited to: offer letters, paystubs, and/or other payroll records." *Id.* ¶¶ 23, 26. Further, CareCentrix allegedly distributed various "routine and non-discretionary bonuses" in addition to CSRs' base pay rate such as a "CSR [sign-on] bonus" and other "non-discretionary bonuses for meeting customer service production and quality standards." *Id.* ¶ 29. All CSRs allegedly received substantially similar training on how to perform their everyday duties including, but not limited to, CareCentrix's general policies, timekeeping, downloading computer programs, and logging in and out of these programs at the beginning and end of each shift. *Id.* ¶ 30. They were also allegedly informed of attendance and scheduling requirements as well as call quality expectations. *Id.* To perform their duties, CSRs allegedly required access to a computer equipped with important computer programs, applications, and servers. *Id.* ¶ 32.

In accordance with CareCentrix's "verbal and/or written policies, training, and direction, as well as the timekeeping system CareCentrix's CSRs utilized for compensation and timekeeping purposes," CSRs allegedly had to be prepared to take calls "the moment their scheduled shift started." *Id.* ¶ 33. In order to be "call ready" at the start of their shift, CSRs reportedly had to begin working before their scheduled start time to "perform a number of off-the-clock tasks that were integral and indispensable to their jobs" including logging into and loading all of the computer programs and applications necessary to carry out their duties. *Id.* Plaintiffs contend, however, that the CSRs were not compensated for any of this "pre-shift work" even though it  had to be done before they could be fully "call-ready" at their scheduled start time. *Id.*

CSRs allegedly were required to perform this "off-the-clock work" before every shift because—since CareCentrix used a web-based timekeeping system to track CSRs' hours—CSRs

could not access, log in, or clock in to the timekeeping program until their pre-shift tasks were completed. *Id.* ¶ 34. Further, CSRs allegedly often encountered technical issues during the "boot-up and login process" which increased the time spent completing these tasks before their shift began. *Id.* During the relevant time, CSRs employed by the CareCentrix allegedly all used the same or similar computer networks, software programs, and applications and could not do their jobs without them. *Id.* ¶ 37. CSRs also reportedly spent time logging out of and shutting down these programs at the end of their shifts after they had already clocked out of the timekeeping system. *Id.* ¶ 38.

Plaintiffs contend that, because of this "off-the-clock work" that CSRs had to perform before the start of their shifts and following the end of their shifts, CareCentrix did not compensate the CSRs for "approximately nine (9) to twelve (12) minutes" of work of every shift. *Id.* ¶ 42. When CSRs worked forty (40) hours or more (including the uncompensated time spent completing pre- and post-shift tasks) in a week, Plaintiffs claim that CareCentrix "violated the FLSA by, inter alia, failing to pay its CSRs for all of this work at the federally mandated rate of 1.5 times each employee's regular hourly wage." *Id.*

CareCentrix allegedly paid its CSRs on a biweekly basis. *Id.* ¶ 64. Plaintiff contends that, throughout the course of her employment, CareCentrix failed to pay her regular wages for work performed and overtime for hours worked in excess of forty hours. Plaintiff provides her pay stub for the pay period of June 3, 2023–June 16, 2023, as an alleged representation of her typical pay statement:

> Plaintiff worked less than 40 hours in one week at a rate of $17.00 per hour and upon information and belief was paid $17.00 for each regular hour worked.
>
> With pre- and post-shift off-the-clock work, Plaintiff should have been paid an additional nine (9) to twelve (12) minutes or more at her regular rate of $17.00 for each regular hour worked.

> Plaintiff worked more than 40 hours in one week at a rate of $17.00 per hour and upon information and belief was paid $25.50 per hour in overtime.
>
> With pre- and post-shift off-the-clock work, Plaintiff should have been paid an additional nine (9) to twelve (12) minutes or more at her overtime rate of $25.50 for each hour worked in excess of 40 in the overtime workweek.

*Id.*

The duties that CSRs needed to perform before clocking in at the start of every shift, took "approximately seven (7) to ten (10) minutes per shift." *Id.* ¶ 50. CSRs were required to complete the following "essential work tasks" before the start of their scheduled shifts and before fielding calls:

a. Turn on their computer;

b. Log into Microsoft Windows using a password;

c. Secure access to Defendant's server via Global Connect, the Virtual Private Network or "VPN", using a dual-authentication process through which they obtained a code and entered it into their cell phone authenticator application;

d. Log into Defendant's Interactive Desktop by identifying the VPN and following various prompts;

e. Open Google Chrome;

f. Open and log into ADP, Defendant's timekeeping system;

g. Open Microsoft Teams, Defendant's application for internal communications with other CSRs, team leads and supervisors;

h. Log into Salesforce, Defendant's application CSRs used to input patient  information and obtain patient case files;

i. Log into Intake98 (Defendant's application CSRs used to verify and obtain patient phone information) using a username and password;

j. Log into Que Manager (a second application CSRs used to verify and obtain patient phone information) using a username and password;

k.  Log into 834 Report (a third application CSRs used to verify and obtain
patient phone information) using a username and password;

l.  Log into Envolve (a fourth application CSRs used to verify and
obtain patient phone information) using a username and password;

m.  Log into Wellcare, a fifth application CSRs used to verify and obtain
patient phone information;

n.  Open log into Bamboo Health (Defendant's application for accessing
patient information) using a username and password;

o.  Open Microsoft Outlook, the application Defendant's CSRs used to
receive and review internal company emails, information from
managers and updates on team meetings; and

p.  Clock into the timekeeping system.

*Id.* CSRs allegedly had to arrive about seven to ten minutes early for their shifts in order to

complete these tasks. *Id.* ¶ 51. Plaintiffs allege that because it was not possible for CSRs to

clock-in before accessing the web-based timekeeping system and CareCentrix did not allow

CSRs to clock-in before their scheduled start time, CSRs were not properly compensated for

all or some of their "off-the-clock" work.  *Id.* ¶ 52.

With respect to post-shift work, Plaintiffs allege that, under CareCentrix's policies,

training, and direction, CSRs were "required to clock-out the moment their shift ended or as

soon as they were done fielding their last customer query for the shift." *Id.* ¶ 55. CSRs

allegedly had to inform and get approval from their team leads if they fielded a call after the

end of their scheduled shift. *Id.* ¶ 56. Reportedly, due to the confidential health information

stored on their computers, CSRs had to shut down their computers after every shift for security

purposes. *Id.* ¶ 55.

CSRs were allegedly expected to clock out "before closing all work applications and

systems they utilized in performing their job duties and shutting down their computer." *Id.*

Plaintiffs allege that this shutting down process required CSRs to perform an additional two (2) minutes of off-the-clock work every shift. *Id.* ¶ 57. Because CSRs allegedly had to use Defendant's web-based timekeeping system, they were unable to clock out after completing their computer shutdown process, and thus, were not compensated for all or some of the time it took them to do so. *Id.* ¶ 58.

Defendant allegedly monitored the CSRs' clock-in times in relation to their start-of-shift time pursuant to schedule adherence and attendance metrics. *Id.* ¶ 36. Defendant also allegedly monitored when the CSRs entered into "ready" status. *Id.* CSRs were reportedly prohibited for working overtime unless pre-approved. *Id.* To enforce these policies, Defendant allegedly provided CSRs with "monthly incentives, including nondiscretionary bonuses, to reach and maintain Defendant's metrics and scoring guidelines." *Id.* Defendant allegedly routinely evaluated CSRs and at times, disciplined them for failing to meet expectations. *Id.* Disciplinary measures supposedly included supervisor coaching, verbal warnings, and termination. *Id.* Plaintiffs claim that, at all relevant times, Defendant "used its attendance and adherence policies against Plaintiff and its CSRs in order to pressure them into performing pre- and post-shift work off-the clock." *Id.* ¶ 39.

Although Defendant allegedly had written policies promising that CSRs would be paid for all hours worked, including overtime, Plaintiffs claim that Defendant did not adhere to these policies. *Id.* ¶ 40. Plaintiff and other CSRs were allegedly not paid for time spent doing pre-shift and post-shift duties that were integral to their job duties. *Id.* Plaintiffs allege that Defendant knew that "by relying exclusively on a web-based timekeeping system, some off-the-clock work was bound to occur every shift." *Id.* ¶ 44. Defendant allegedly "possesses, controls, and/or has access to information and electronic data" regarding the times CSRs

started up and logged in to their computers every shift, when they clocked in and out of the timekeeping system, and when they faced technical difficulties. *Id.* ¶¶ 46–47.

Because the CSRs allegedly had to spend time completing tasks that could only be performed before or after they were able to access the web-based timekeeping system, the time logged in the system and shown on the CSRs' pay stubs are "inaccurate representations of the hours they worked." *Id.* ¶ 49. By allegedly failing to track and compensate Plaintiff and other CSRs for this time spent working, Plaintiffs claim that Defendant breached its agreements with the CSRs. *Id.* ¶ 43. Plaintiffs contend that, in light of explicit DOL rules, "there is no conceivable way for Defendant to establish that it acted in good faith." *Id.* ¶ 45.

This pre- and post-shift "off-the-clock work" allegedly was essential to CSRs' job responsibility, and Defendant "directly benefitted" when CSRs performed these uncompensated duties. *Id.* ¶¶ 54, 60. Plaintiffs claim that Ms. Jones, and similarly situated CSRs, regularly worked non-overtime hours (i.e., "gap time") for which they were not paid. *Id.* ¶ 62. When CSRs did not work over forty hours in a workweek, Plaintiffs allege that Defendant's policies and practices deprived them of "straight time wages," in breach of their employment agreements with Defendant. *Id.* ¶ 63.

Plaintiffs also allege that when CSRs worked forty hours or more per week (including the uncompensated time spent doing pre- and post-shift duties), Defendant deprived them of overtime wages and "violated the FLSA by failing to (1) pay them the federally mandated overtime compensation for all work performed; (2) incorporate non-discretionary bonuses earned in said workweeks into its CSRs' regular rate calculations, and resulting overtime calculations; and (3) record all of the time that its CSRs, including Plaintiff, worked for Defendant's benefit." *Id.* ¶ 53.

Specifically, as is relevant to this partial motion to dismiss, regarding incorporating non-discretionary bonuses earned into pay rate calculations the, Ms. Jones alleges that "Defendant failed to include non-discretionary bonuses into the regular rate of pay for Plaintiff and all others similarly situated when calculating overtime rates." *Id.* ¶ 113.

### B.  Procedural History

On August 10, 2023, Plaintiff filed her Complaint in the United States District Court for the District of Connecticut. Compl., ECF No 1.

On October 24, 2023, Defendant moved to dismiss. Def. Mot. to Dismiss, ECF No. 22.

On November 14, 2023, Plaintiff filed an Amended Complaint. Am. Compl.

On November 28, 2023, Defendant filed a partial motion to dismiss the Amended Complaint only moving to dismiss part of Count I of Ms. Jones's claim. Partial MTD; Mem. Supporting CareCentrix's Partial Mot. to Dismiss, ECF No. 37-1 ("Mem. ISO Partial MTD"). Defendant included an exhibit with this filing—a signed declaration from Kerri Eisenshtat, CareCentrix's Senior Payroll Manager. Mem. ISO Partial MTD at 16–18 ("First Eisenshtat Decl.").

On December 18, 2023, Plaintiff filed a response to Defendant's motion to dismiss. Pl. Response in Opp. to Def.'s Mot. to Dismiss the First Am. Compl., ECF No. 38 ("Response").

On January 2, 2024, Defendant filed a reply to Plaintiff's response. Reply to Response, ECF No 40 ("Reply"). Defendant included three exhibits with this filing—another signed declaration from Kerri Eisenshtat, Ex. A., ECF No 40-1 at 1–7 ("Second Eisenshtat Decl."), all of Ms. Jones's pay slips throughout her employment with CareCentrix, Ex. 1, ECF No 40-1 at 8–47 ("Pay Slips"), and Ms. Jones's offer letter and acceptance from CareCentrix, Ex. 2, ECF No. 40-1 at 48–52 ("Offer Letter").

On April 8, 2024, Plaintiff moved for conditional class certification. Pl. Mot. to Cert. Class., ECF No. 44.

On May 8, 2024, Defendant filed an opposition to the motion for conditional class certification. Mem. in Opp. to Mot. to Certify Class, ECF No. 48.

On May 21, 2024, Plaintiff filed a reply to Defendant's opposition to the motion for conditional class certification. Reply to Response to Mot. to Certify Class, ECF No. 49.

On July 2, 2024, the Court issued an Order granting Ms. Jones leave to file a sur-reply to address the evidence proffered by the Defendant. *See* Order, ECF No. 52 ("In its reply brief, CareCentrix provided this 'essential documentation.' But, leaving aside whether CareCentrix needed to have provided this information in support of its initial motion, Plaintiff could not respond to this reply brief without leave of Court. To the extent that Plaintiff wishes to file a sur-reply brief to address the documentation in Defendant's reply brief, such leave is *sua sponte* granted[.]" (citations omitted)).

On July 19, 2024, Ms. Jones filed a sur-response. *See* Pl. Sur-Response in Opp. to Def.'s Partial Mot. to Dismiss, ECF No. 53 ("Sur-Response").

## II.     STANDARD OF REVIEW

### A.  Rule 12(b)(1)

Federal courts are "courts of limited jurisdiction." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). "A case is properly dismissed for lack of subject matter jurisdiction under [Federal Rule of Civil Procedure] 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000); Fed. R. Civ. P. 12(b)(1). "When considering a motion to dismiss pursuant to Rule

12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000); *see also Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (quoting *Sweet*, 235 F.3d at 83). The court also may resolve disputed jurisdictional fact issues, however, "by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Karlen ex rel. J.K. v. Westport Bd. of Educ.*, 638 F. Supp. 2d 293, 298 (D. Conn. 2009) (citing *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)).

### B.  Rule 12(b)(6)

Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the

court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court

also views the allegations in the light most favorable to the plaintiff and draws all inferences

in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see

also York v. Ass'n of the Bar of the City of New York.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On

a motion to dismiss for failure to state a claim, we construe the complaint in the light most

favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review

"to the facts as asserted within the four corners of the complaint, the documents attached to the

complaint as exhibits, and any documents incorporated in the complaint by reference."

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also

consider "matters of which judicial notice may be taken" and "documents either in plaintiffs'

possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am.

Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst,

Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III.    DISCUSSION

CareCentrix has moved to dismiss part of Count I of Ms. Jones's Amended Complaint

under 12(b)(1) and under 12(b)(6), specifically the part of the claim alleging a violation of the

FLSA because of a failure to properly calculate rates to include nondiscretionary bonuses.

### A.  Subject Matter Jurisdiction under 12(b)(1)

"The party invoking federal jurisdiction 'has the burden of proving by a preponderance of

the evidence that it exists.'" *Martin v. United Bridge Cap., LP*, No. 21-1790-CV, 2022 WL

2166399, at *2 (2d Cir. June 16, 2022) (quoting *Makarova v. United States*, 201 F.3d 110, 113

(2d Cir. 2000)). "As part of this burden, plaintiffs must establish that they have standing to sue." *Id.* (citing *Rajamin v. Deutsche Bank Nat'l Trust Co*., 757 F.3d 79, 84 (2d Cir. 2014)); *see also Treiber v. Aspen Dental Mgmt., Inc*., 635 F. App'x 1, 4 (2d Cir. 2016) ("Because plaintiffs have not demonstrated the cognizable injury necessary for Article III standing, the district court properly dismissed the complaint under Rule 12(b)(1)."). When deciding subject-matter jurisdiction, courts "may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113.

"In order for a litigant to have standing to bring a case, that litigant must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Omar Islamic Ctr. Inc. v. City of Meriden*, 633 F. Supp. 3d 600, 610–11 (D. Conn. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

"There are two types of motions to dismiss for lack of standing: facial and factual." *Id.* (citing *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)). "'Rule 12(b)(1) motion[s] challenging subject matter jurisdiction may be either facial,' i.e., based solely on the allegations of the complaint and exhibits attached to it, 'or fact-based,' i.e., based on evidence beyond the pleadings." *Harty v. W. Point Realty, Inc*., 28 F.4th 435, 441 (2d Cir. 2022) (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)).

> When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the "Pleading"), the plaintiff has no evidentiary burden. The task of the district court is to determine whether the Pleading "allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue."
>
> Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading. In opposition to such a motion, the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant "if the affidavits submitted on a 12(b)(1) motion . . . reveal

the existence of factual problems" in the assertion of jurisdiction.

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016) (citations omitted); *see also Doody v. Bank of Am., N.A.*, No. 3:19-CV-1191 (VDO), 2024 WL 20706, at *2 (D. Conn. Jan. 2, 2024) ("The pleading must show[ ] by a preponderance of the evidence that subject matter jurisdiction exists . . . It is only where jurisdictional facts are placed in dispute that the court has the obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." (quoting *Harty v. W. Point Realty, Inc*., 28 F.4th 435, 442 (2d Cir. 2022) (internal quotation marks omitted)).

When the defendant has made a factual challenge to standing, the plaintiff must come forward with evidence to controvert that presented by the defendant. *See Carter*, 822 F.3d at 57 ("[A] defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading. In opposition to such a motion, the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction.'" (citing *Amidax Trading Grp. V. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011); *Robinson v. Government of Malaysia*, 269 F.3d 133, 140 n.6 (2d Cir. 2001); *Kamen v. American Telephone & Telegraph Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986); and quoting *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976))).

While CareCentrix raises both a fact-based 12(b)(1) and a facial 12(b)(1) challenge to Ms. Jones's standing, *see* Mem. ISO Partial MTD, the Court will address the fact-based challenge, as both parties cite to CareCentrix's exhibits in their argument. The crux of CareCentrix's 12(b)(1) challenge is that Ms. Jones has failed to establish an "injury-in-fact." *Id.*

at 6–7 ("Jones cannot satisfy constitutional standing requirements by claiming injuries arising out of CareCentrix's failure to take into account non-discretionary bonuses when computing overtime pay. . . . Plaintiff incorrectly asserts CareCentrix imposed a policy upon Customer Service Representatives in which CareCentrix did not incorporate non-discretionary bonuses into Customer Service Representatives' regular rate calculations, and by extension, overtime calculations.").

a.  <u>Factual Challenge</u>

Defendant argues that Ms. Jones's claim that CareCentrix failed to include non-discretionary bonuses into calculations of Plaintiff's regular and overtime rate calculations lacks standing because Ms. Jones has failed to state an injury. *Id.* at 6 ("Plaintiff incorrectly asserts CareCentrix imposed a policy upon Customer Service Representatives in which CareCentrix did not incorporate non-discretionary bonuses into Customer Service Representatives' regular rate calculations, and by extension, overtime calculations."). CareCentrix argues that it does, in fact, account for nondiscretionary bonuses when computing overtime pay. *Id.* at 7. In support, Defendant has submitted a declaration of its Senior Payroll Manager. *See* First Eisenshtat Decl.

In response, Ms. Jones argues that the declaration upon which the Defendant relies is inadequate for four reasons. Response at 7 ("Defendant relies exclusively on the declaration of Kerri Eisenshtat to support its allegation that Plaintiff cannot satisfy constitutional standing requirements for the regular rate portion of her FLSA claim, but the assertions contained therein are insufficient to warrant dismissal[.]"). Ms. Jones also argues that "Defendant, despite possessing these paystubs, being able to easily produce them in the context of this Motion, and having the opportunity to perform the simple mathematical calculation to support its position, failed to do so does not establish that the company included and properly calculated Plaintiff[']s

regular rate of pay and resulting overtime rates." *Id.*

First, Ms. Jones argues that the declaration falsely states that Ms. Jones could earn more than one non-discretionary bonus. *Id.* at 8.

Second, Ms. Jones argues accounting for non-discretionary bonuses when computing overtime compensation—as the declaration alleges Defendant has—neither guarantees nor establishes that regular rate and resulting overtime rates were properly calculated. *Id.*

Third, Ms. Jones argues that the declaration contains hearsay that cannot be relied upon for a 12(b)(1) motion. *Id.*

Fourth, Ms. Jones argues that here, unlike in *Marcial v. New Hudson Family Restaurant Inc.*, 2019 WL 1900336, at *6 (S.D.N.Y. Apr. 29, 2019), questions of fact exist regarding whether Plaintiff has standing sufficient to survive a factual 12(b)(1) motion to dismiss. *Id.* at *9.

In reply, CareCentrix argues that while it "has no obligation to produce all of Plaintiffs' paystubs in order to mount a successful factual challenge to standing," it submits as exhibits all of Ms. Jones's payroll statements. Reply at 4.

In support of its reply to Ms. Jones's first three arguments in her response, CareCentrix submits another declaration from its Senior Payroll Manager, Second Eisenshtat Decl., to support its claims that Plaintiff received three (3) non-discretionary bonuses, each through the Monthly Production Incentive Plan ("MPIP"), which was the only non-discretionary bonus plan in which Plaintiff could participate during her employment with CareCentrix. *Id.* (citing Second Eisenshtat Decl. ¶¶ 7, 10).

The MPIP is a non-discretionary bonus plan in which an eligible employee can earn a bonus based on "meeting production and quality goals during defined monthly periods[.]" *Id.* (citing Second Eisenshtat Decl. ¶ 7) A bonus earned through the MPIP is referred to as a "CSC

Bonus, and CSC Bonuses are factored into overtime calculations." *Id.* at 4–5 (citing Second Eisenshtat Decl. ¶¶ 11–14). The declaration also stated that CareCentrix does not have a verbal or written policy governing sign-on bonuses, *Id.* at 6; Second Eisenshtat Decl. ¶ 25, CareCentrix does not uniformly offer sign-on bonuses to all potential non-exempt employees, *id.*, CareCentrix uses sign-on bonuses depending on its hiring needs at any given time, *id.*, and the terms and amounts of sign-on bonuses, when offered, vary. *Id.* CareCentrix argues that therefore, under the applicable United States Department of Labor guidelines, the sign-on bonus is considered a discretionary bonus that should not have been included in Plaintiff's regular rate or overtime rate calculations. Reply at 6.

CareCentrix also argues that this case, like in *Marcial*, 2019 WL 1900336, the Plaintiff lacks standing for the FLSA claim because the evidence offered by Defendant establishes that Plaintiff's allegations are incorrect. Reply at 7.

The Court disagrees, for now.

As an initial matter, district courts have broad discretion when considering extrinsic evidence. *See Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022) ("Supreme Court caselaw makes clear that district courts have broad discretion when determining how to consider challenges to subject matter jurisdiction."); *see also Wang v. Delphin-Rittmon*, 664 F. Supp. 3d 205, 215–16 (D. Conn. 2023) ("[W]hen a court evaluates a motion to dismiss under Rule 12(b)(1), it may—and sometimes must—consider extrinsic evidence such as affidavits that contradict the allegations of the complaint in order to determine whether there is federal subject matter jurisdiction.").

First, as to Ms. Jones's argument that she could earn more than one non-discretionary bonus, because she was also paid a "Sign On Bonus," after ninety days of continuous full-time

employment, Defendants have not disputed the payment of his bonus but have presented facts

showing that it was discretionary. *See* Second Eisenshat Decl. ¶¶ 22–25 ("the only other bonus

paid to Jones during her employment with CareCentrix was a sign-on bonus in the amount of

$1,000.00. This sign-on bonus was paid on March 17, 2023. The sign-on bonus was subject to a

clawback provision . . . . This sign-on bonus is considered a discretionary bonus, and is therefore

not considered in the regular rate of pay for non-exempt CareCentrix employees for purposes of

calculating overtime." (citing Offer Letter ("Sign-On Bonus: *$1,000.00 to be paid in the pay

cycle after 90 days of continuous full-time employment; subject to withholding of all applicable

taxes. If you should leave CareCentrix voluntarily or involuntarily within 1 year from your date

of hire, we may require you to pay back the full amount of this sign-on bonus."))).[3] Therefore,

unless Ms. Jones can present evidence to refute that the sign-on bonus was discretionary, it

should not be factored into her rate calculations.

  Second, as to Ms. Jones's argument that the declaration contains unreliable hearsay for

the purposes of a 12(b)(1) motion, Response at 8, she cites *Carter*, 822 F.3d at 57. But that

Second Circuit decision also stands for this proposition:

> [A] defendant is permitted to make a fact-based Rule 12(b)(1)
> motion, proffering evidence beyond the Pleading. In opposition to
> such a motion, the plaintiffs will need to come forward with
> evidence of their own to controvert that presented by the defendant
> "if the affidavits submitted on a 12(b)(1) motion . . . reveal the
> existence of factual problems" in the assertion of jurisdiction.
> However, the plaintiffs are entitled to rely on the allegations in the
> Pleading if the evidence proffered by the defendant is immaterial
> because it does not contradict plausible allegations that are
> themselves sufficient to show standing.
>
> If the extrinsic evidence presented by the defendant is material and
> controverted, the district court will need to make findings of fact in

---

[3] Defendants additionally allege that "although Plaintiff was paid the sign-on bonus, she did not work for
CareCentrix for a full year, and CareCentrix demanded the return of the sign-on bonus, pursuant to the clawback
provision. Plaintiff has failed to pay back any portion of the sign-on bonus to date." Reply at 6 (citations omitted).

aid of its decision as to standing. On appeal, "if the [district] court .
. . resolved disputed facts, we will accept the court's findings unless
they are 'clearly erroneous.'"

*Carter*, 822 F.3d at 57 (citations omitted)). As a result, given that Defendant's evidence is a

signed affidavit from CareCentrix's Senior Payroll Manager, provided after reviewing Ms.

Jones's pay stubs, CareCentrix has proffered evidence that "reveal[s] the existence of factual

problems[,]" *id.*, and Ms. Jones has not "come forward with evidence of [her] own to controvert

[it.]" *Id.*; *see also SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020) ("[A] motion

under Rule 12(b)(1) may . . . rely on evidence beyond the pleadings. When a defendant makes

such a fact-based motion, the plaintiff may respond with evidence of its own." (citation

omitted)); *MSP Recovery Claims, Series LLC v. Hereford Ins. Co*., 66 F.4th 77, 84 (2d Cir. 2023)

("In concluding that MSP failed adequately to allege causation, the district court also relied on

the Affidavit of Samuel Rubin[, Hereford's Compliance Coordinator], submitted by Hereford in

support of its Rule 12(b)(1) motion."); *but see Trustees of Int'l Union of Bricklayers & Allied*

*Craftworkers Loc. 1 Conn. Health Fund v. Elevance, Inc*., No. 3:22-CV-1541 (VDO), 2024 WL

1707223, at *5 (D. Conn. Apr. 22, 2024) ("Defendant's attempt to mount a fact-based challenge

to the allegations that Plaintiffs have contracts with each of the defendants falls short. The

attempt rests on unauthenticated documents which purport to be excerpts of contracts between

the plaintiffs and one defendant. Indeed, Plaintiffs dispute the authenticity of these exhibits,

noting that the documents are draft documents that do not contain Plaintiffs' signatures. The

Court therefore finds that these documents fall short of what is needed to contradict the

allegations that contracts between the parties caused monetary injury to Plaintiffs." (citation

omitted)). Accordingly, the Court finds that it can properly rely on CareCentrix's exhibits.

Third, as to Ms. Jones's argument that here, unlike in *Marcial*, 2019 WL 1900336,

factual questions exist regarding whether Ms. Jones has standing sufficient to survive a factual 12(b)(1) motion to dismiss, Response at 9, Ms. Jones cites to that court's discussion of a facial challenge. *See Marcial*, 2019 WL 1900336, at *6 ("based on the face of the Second Amended Complaint, there is no violation of the FLSA's minimum wage provision, Plaintiff has not alleged an injury for count one and therefore does not have standing for that claim. Count one must be dismissed under Federal Rules of Civil Procedure Rule 12(b)(1) for want of subject matter jurisdiction."). The court in *Marcial* was presented, like here, with both facial and factual challenges, and it granted the facial challenge but then went on to state that it would have also granted a factual challenge. *Id.* ("Even if Defendants had not argued that Plaintiff failed to facially show that Plaintiff had standing to bring a FLSA minimum wage claim, the Court would still grant Defendants' Rule 12(b)(1) motion on the grounds that Plaintiff lacks factual standing."). Here, the Court will address CareCentrix's factual challenge first.

Fourth, as to Ms. Jones's argument that CareCentrix should have produced her pay stubs and performed the mathematical calculation to support its position, in its reply CareCentrix has produced every pay stub from Ms. Jones's employment, *see* Pay Slips, and has provided the mathematical calculations for every non-discretionary bonus Ms. Jones received. Eisenshtat Decl. ¶¶ 17–19. CareCentrix thus has submitted affidavits "reveal[ing] the existence of factual problems in the assertion of jurisdiction[,]" *Carter*, 822 F.3d at 57 (citations omitted), and therefore "the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant[.]" *Id.* Ms. Jones has not come forward with any evidence of her own, but she argues that CareCentrix's proffered evidence shows a miscalculation. Ms. Jones argues that accounting for non-discretionary bonuses when computing overtime compensation neither guarantees nor establishes that regular rate and resulting overtime rates were properly calculated.

Response at 8.

The Court will further address the issue of rate calculation below.

      b.  <u>Rate Calculations When Adjusting for Non-Discretionary Bonuses</u>

CareCentrix argues that its actual policies contradict Ms. Jones's assertions. Mem. ISO Partial MTD at 8 ("CareCentrix's overtime pay policy does account for non-discretionary bonuses when calculating overtime pay." (citing First Kerri Eisenshtat Decl. ¶¶ 15–17.)) CareCentrix argues that these policies "foreclose Jones's ability to satisfy constitutional standing requirements in connection with the portion of her FLSA claim relying on the Overtime Calculation Policy." *Id.* In support of this, CareCentrix submitted pay stubs as exhibits. *See* Pay Slips at 12, 22, 36 (including on three separate pay stubs an additional line listing a payment amount for "RETRO OVERTIME"). The non-discretionary CSC bonus was paid to Ms. Jones a total of three times total during her seven months of employment with CareCentrix,[4] and each

---

[4] The calculations in the declaration state the following:

        Jones was paid her first CSC Bonus on February 17, 2023 in the gross amount of $386.34. This CSC Bonus was for the time period of January 1, 2023 through January 28, 2023. During that time period, Jones worked 0.03 hours of overtime, and was originally paid $0.77 for that overtime, as reflected in the February 3, 2023 pay statement. The original regular rate during this time period was $17.00 per hour, and the original overtime rate was $25.50 per hour. On the paycheck issued on February 17, 2023, CareCentrix included a retroactive overtime payment of $0.11. For the retroactive overtime payment, the new regular rate was $19.39 per hour, and the new overtime rate was $29.09 per hour, pursuant to the calculation method described above.

        Jones was paid her second CSC Bonus on April 28, 2023 in the gross amount of $527.81. This CSC Bonus was for the time period of February 26, 2023 through March 25, 2023. During that time period, Jones worked 0.25 hours of overtime, and was originally paid $6.38 for that overtime, as reflected in the March 17, 2023 and March 31, 2023 pay statements. The original regular rate during this time period was $17.00 per hour, and the original overtime rate was $25.50 per hour. On the paycheck issued on April 28, 2023, CareCentrix included a retroactive overtime payment of $1.24. For the retroactive overtime payment, the new regular rate was $20.29 per hour, and the new overtime rate was $30.44 per hour, pursuant to the calculation method described above.

        Jones was paid her third CSC Bonus on June 23, 2023 in the gross amount of $536.72. This CSC Bonus was for the time period of April 30, 2023 through May

time, it was paid retroactively for the difference in the higher rate that was calculated, taking into account the increased rate from the addition of the CSC bonus. *See* Second Eisenshat Decl. ¶¶ 13–14 ("Because the CSC Bonus is awarded and paid in the calendar month after it was earned the CSC Bonus is not originally factored into any overtime calculations during the Performance Month in which the CSC Bonus is earned. Therefore, CareCentrix makes a retroactive overtime payment to an employee who worked overtime hours during the Performance Month in which the employee earned a CSC Bonus. The retroactive overtime payment represents the difference between the overtime rate originally paid to the employee and the overtime rate that includes the CSC Bonus. In order to calculate the appropriate overtime rate for an employee who earns a CSC Bonus, CareCentrix runs reports at the time the CSC Bonus is paid in order to determine how many overtime hours were worked by the employee during the Performance Month for which the CSC Bonus was earned. CareCentrix adds the CSC Bonus to the gross amount of wages paid to the employee during the Performance Month for which the CSC Bonus was earned, and then calculates the new regular rate and new overtime rate. CareCentrix then calculates how much the employee should have been paid at the new overtime rate, subtracts the amount of overtime compensation that was already paid to the employee, and pays the employee the difference.").

In response, Ms. Jones argues that "[r]egardless of whether Plaintiff can actually prove that the non-discretionary bonuses were properly included in her regular rate and resulting

---

27, 2023. During that time period, Jones worked 0.02 hours of overtime, and was originally paid $0.51 for that overtime, as reflected in the May 26, 2023 pay statement. The original regular rate during this time period was $17.00 per hour, and the original overtime rate was $25.50 per hour. On the paycheck issued on June 23 , 2023, CareCentrix included a retroactive overtime payment of $0.10. For the retroactive overtime payment, the new regular rate was $20.35 per hour, and the new overtime rate was $30.53 per hour, pursuant to the calculation method described above.

Decl. 2 of Eisenshat ¶¶ 17–19.

overtime rate calculations and that said calculations were accurately computed, she has sufficiently alleged that she and the putative FLSA Collective were harmed by not being paid on time and in full, and that is enough to survive a motion to dismiss at this stage." Response at 6.

In reply, CareCentrix argues that "[a]lthough Plaintiff sets forth a chart of allegations she contends support her FLSA claim concerning regular and overtime rate calculations, she does not—and cannot—identify any allegations in the Amended Complaint which identify with particularity (a) any non-discretionary bonus received by Plaintiff, (b) any time period in which she received overtime compensation and earned a non-discretionary bonus, or (c) any pay period in which her overtime rate was improperly calculated." Reply at 9 (citing Response at 10–12).

In her sur-reply, Ms. Jones argues that CareCentrix's "evidence illustrates that it is liable for miscalculating its employees' regular rate of pay[.]" Sur-Response at 2. She argues "Defendant rounded the amount owed to Plaintiff Jones for her retroactive overtime payment to the nearest cent, resulting in underpayment of approximately $0.001. In Plaintiff's view, Defendant admits that it utilizes this method of calculation for all of its employees, and, thus, is liable to Plaintiffs, the proposed collective, and the proposed class for unpaid overtime – precisely as Plaintiff's complaint alleges." *Id.* at 4 (citations omitted). She provides the following chart as an example to "highlight Defendant's failure to properly pay pursuant to the FLSA's regular rate calculation" using her third CSC Bonus in the amount of $536.72. *Id.* at 3.

| Step | Plaintiff's Calculation | Defendant's Calculation |
|---|---|---|
| 1 | 40.02 x $17 = $680.34 | |
| 2 | $680.34 + $134.18 ($536.72 Bonus / 4 workweeks) = $814.52 | |
| 3 | $814.52 / 40.02 = $20.353 | |

| 4 | $20.353 x 1.5 = $30.53 | $30.53 |
|---|---|---|
| 5 | $30.53 x .02 = $0.611 | |
| 6 | $0.611 – $0.51 = **0.101** | |
| 7 | **$0.101** | **$0.10** (Doc. 40-1, p. 5, ¶ 19; Doc. 40-1, p. 12) |

*Id*. at 4 (emphasis included).

Ms. Jones argues that CareCentrix's calculation method of rounding the amounts owed for retroactive overtime payment to the nearest cent results in an underpayment, *see id.* at 4 ("Defendant rounded the amount owed to Plaintiff Jones for her retroactive overtime payment to the nearest cent, resulting in underpayment of approximately $0.001"), and the underpayment is one-tenth of a cent.

Using Ms. Jones's seven "steps for calculating the proper regular rate[,]" Sur-Response at 3–4, the calculations do not demonstrate a systematic underpayment; in fact, of the three times Ms. Jones was paid a non-discretionary CSC bonus, it resulted in an overpayment on one of those occasions. Overall, CareCentrix (1) overpaid Ms. Jones $0.00642330752 for the first bonus; (2) underpaid Ms. Jones $0.0239673913 for the second bonus; and (3) underpaid her $0.00058471764 for the third bonus. In sum, she was overpaid $0.00700802516 and overpaid $0.0239673913. In total, she was underpaid $0.01695936614. The following charts compare the Defendant's calculations with Court's calculations using Plaintiff's seven-step method.[5]

**CareCentrix's additional pay when considering non-discretionary CSC bonus amounts in calculating pay rates:**

| | Plaintiff's | Defendant's | Court's Calculation |
|---|---|---|---|

---

[5] The Court has not rounded any numbers in any of its calculations.

|  | Calculation | Calculation |  |
|---|---|---|---|
| First CSC Bonus in the amount of $386.34 |  | **$0.11** | **$0.10357669248** |
| Second CSC Bonus in the amount of $527.81 |  | **$1.24** | **$1.2639673913** |
| Third CSC Bonus in the amount of $536.72 | **$0.101** | **$0.10** | **$0.10058471764** |

**Calculation of Steps 1–7 of Ms. Jones's first CSC Bonus in the amount of $386.34:**

| Step | Plaintiff's Calculation | Defendant's Calculation |
|---|---|---|
| 1 | 40.03 x $17 = $680.51 |  |
| 2 | $680.51 + $96.585 ($386.34 Bonus / 4 workweeks) = $820.4525 |  |
| 3 | $777.095 / 40.03 = $19.4128153885 | New regular rate: $19.39 per hour |
| 4 | $19.4128153885 x 1.5 = $29.1192230827 | New overtime rate: $29.09 per hour (Original rate: $25.50) |
| 5 | $29.1192230827 x .03 = $0.87357669248 | $29.02 x .03 = $0.8727 |
| 6 | $0.87357669248 – $0.77 = **$0.10357669248** | $0.8727 – $0.77 = $0.1027 |
| 7 | **$0.10357669248** | **$0.11** (Doc. 40-1, at 4–5, ¶ 17; Doc. 40-1, p. 34, 36) |

**Calculation of Steps 1–7 of Ms. Jones's second CSC Bonus in the amount of $527.81:**

| Step | Plaintiff's Calculation | Defendant's Calculation |
|---|---|---|
| 1 | 40.25 x $17 = $688.50 |  |

| 2 | $688.50 + $131.9525 ($527.81 Bonus / 4 workweeks) = $820.4525 | |
| 3 | $820.5425 / 40.25 = $20.3839130435 | New regular rate: $20.29 per hour |
| 4 | $20.3839130435 x 1.5 = $30.5758695652 | New overtime rate: $30.44 per hour (Original rate: $25.50) |
| 5 | $30.5758695652 x .25 = $7.6439673913 | $30.44 x .25 = $7.61 |
| 6 | $7.6439673913 – $6.38 = **$1.2639673913** | $7.61 – $6.38 = $1.23 |
| 7 | **$1.2639673913** | **$1.24** (Doc. 40-1, p. 5, ¶ 18; Doc. 40-1, p. 20, 22) |

**Calculation of Steps 1–7 of Ms. Jones's third CSC Bonus in the amount of $536.72:**

| Step | Plaintiff's Calculation. | Defendant's Calculation |
|---|---|---|
| 1 | 40.02 x $17 = $680.34 | |
| 2 | $680.34 + $134.18 ($536.72 Bonus / 4 workweeks) = $814.52 | |
| 3 | $814.52 / 40.02 = $20.353 *Court's calculation: $20.3528235882* | New regular rate: $20.35 per hour |
| 4 | $20.353 x 1.5 = $30.53 *Court's calculation: $30.5292353823* | New overtime rate: $30.53 per hour (Original rate: $25.50) |
| 5 | $30.53 x .02 = $0.611 *Court's calculation: $0.61058470764* | $30.53 x .02 = $0.6106 |
| 6 | $0.611 – $0.51 = **0.101** | $0.6106 – $0.51 = 0.1006 |

| | *Court's calculation: $0.10058471764* | |
|---|---|---|
| 7 | **$0.101** <br><br> *Court's calculation: $0.10058471764* | **$0.10** (Doc. 40-1, p. 5, ¶ 19; <br> Doc. 40-1, p. 12) |

Ms. Jones alleges an injury under the FLSA with regard to how CareCentrix calculated her regular rate and her overtime rate to include her non-discretionary CSC bonus earned through the MPIP program. She argues that the calculation method of how CareCentrix adjusts rates, with retroactive payments, to include the CSC bonus, is flawed. Ms. Jones also argues that because her "relatively short period of employment with Defendant and the fact that she only received three (3) CSC Bonuses, the data is simply too scant to perform the type of analysis required for determining the full scope of the issues present with Defendant's CSC Bonus application and its retroactive overtime payment[,]" Sur-Response at 5–6 (citation omitted), and "discovery is necessary to assess the existence of additional issues with Defendant's regular rate calculations.[,]" *id.* at 4.

The Court agrees, for now.

> Under the FLSA, an employer must pay overtime at one and one-half times the employee's "regular rate" of pay. 29 U.S.C. § 207(a)(1). An employee's regular rate includes "all remuneration for employment paid to, or on behalf of the employee," with certain enumerated exceptions. *Id.* § 207(e). Whether an employer must include a bonus in determining an employee's regular rate depends on whether the bonus is discretionary or non-discretionary. *See* 29 C.F.R. § 778.211. A bonus is discretionary, and therefore excludable, if the employer retains discretion as to both the fact of payment and the amount "until a time quite close to the end of the period for which the bonus is paid." *Id.* § 778.211(b). Bonuses "announced to employees to induce them to work more steadily or more rapidly or more efficiently or to remain with the firm are regarded as part of the regular rate of pay.

*Freeland v. Findlay's Tall Timbers Distribution Ctr., LLC*, 681 F. Supp. 3d 58, 66 (W.D.N.Y.

2023).

Based on the evidence submitted, CareCentrix has underpaid Ms. Jones by
$0.01695936614. And "[i]f a defendant has caused physical or monetary injury to the plaintiff,
the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*,
594 U.S. 413, 425 (2021). "For standing purposes, a loss of even a small amount of money is
ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp*., 580 U.S. 451, 464 (2017) (citing
*McGowan v. Maryland*, 366 U.S. 420, 430–431 (1961)); *see also Gillett v. Zara USA, Inc*., No.
20 CIV. 3734 (KPF), 2022 WL 3285275, at *6 (S.D.N.Y. Aug. 10, 2022) ("That Defendants'
delay was only a week or that the economic harm may amount to a relatively meager sum in
absolute terms does not relegate Plaintiff's injury in fact beyond the bounds of Article III.").

When only calculating underpayment of Ms. Jones's claim in Count I alleging FLSA
violations in the rate calculations regarding non-discretionary bonuses, the Court will not rule
that Ms. Jones does not have standing, because, based on the evidence before the Court, Ms.
Jones has been underpaid by $0.01695936614. *See*, *e.g.*, *Freeland v. Findlay's Tall Timbers
Distribution Ctr., LLC*, 681 F. Supp. 3d 58, 67–68 (W.D.N.Y. 2023) ("Plaintiff also plausibly
alleges that Defendant failed to properly calculate Plaintiff's rate of pay.").

As a result, limited and directed discovery will be allowed into any and all wages
allegedly owed to Ms. Jones—and Ms. Jones alone—and, if so, how much. This discovery,
although limited to Ms. Jones, will not be limited to her claim under Count I of the Amended
Complaint, but to all of her claims in the Amended Complaint. *See Singh v. City of New York*,
524 F.3d 361, 370–71 (2d Cir. 2008) ("The *de minimis* doctrine permits employers to disregard,
for purposes of the FLSA, otherwise compensable work '[w]hen the matter in issue concerns
only a few seconds or minutes of work beyond the scheduled working hours.'" (quoting

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946))); *see also Perry v. City of New York*, 78 F.4th 502, 509 (2d Cir. 2023) ("The *de minimis* inquiry generally applies to the claimed work *as a whole*, not to *each task* the employer requires.") (emphasis in original). Specifically, as to the calculation issue, the issue is whether Ms. Jones was consistently underpaid. *Cf.* 29 C.F.R. § 785.48(b) ("For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked."); *Adams v. Bloomberg L.P.*, No. 20-CV-7724 (RA), 2023 WL 5769492, at *6 (S.D.N.Y. Sept. 7, 2023) (finding "that the loss of less than three hours of compensation over the course of approximately three years is a *de minimis* amount and does not render a rounding policy non-neutral"); *see also id.* ("Indeed, it is unrealistic to expect a rounding policy to even out perfectly to the dollar, even over a substantial period of time.").

### B. Failure to state a claim under 12(b)(6)

When a defendant "moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Treiber v. Aspen Dental Mgmt., Inc.*, 94 F. Supp. 3d 352, 360–61 (N.D.N.Y. 2015), *aff'd*, 635 F. App'x 1 (2d Cir. 2016) (quoting *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1155–56 (2d Cir. 1993)). "A district court properly dismisses a case for lack of subject matter jurisdiction where it 'lacks the statutory or constitutional power to adjudicate it.'" *Id.* (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000)); *see also Marcial*, 2019 WL 1900336, at *7 (S.D.N.Y. Apr. 29, 2019) ("As the Court has determined that it does not have subject matter over Plaintiff's FLSA

minimum wage claim, it will not conduct a Rule 12(b)(6) analysis.").

Accordingly, as the Court will allow limited directed discovery, Court will deny without prejudice to renewal the issues raised in the 12(b)(6) motion, until the completion of this limited discovery, and if appropriate, raised in the context of a Rule 56 motion for summary judgment. *See Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' partial motion to dismiss the portion of Count I claiming that CareCentrix's consideration of non-discretionary bonuses when calculating pay rates violates the FLSA is **DENIED**.

The Court will allow limited directed discovery into the total amount of any and all wages allegedly owed to Ms. Jones—and Ms. Jones's alone. Discovery will not be limited to those wages related to Count I.

**SO ORDERED** at New Haven, Connecticut, this 2nd day of August, 2024.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE